IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

CHARLES F. TAYLOR,                )
                                  )
                 Petitioner,      )
                                  )
vs.                               )        Case No. CIV-01-252-JHP-KEW
                                  )
MARTY SIRMONS, Warden, Oklahoma   )
State Penitentiary,               )
                                  )
                 Respondent.      )

## OPINION AND ORDER

Petitioner, Charles F. Taylor, was convicted following a jury trial, in the District Court of Pittsburg County, Case No. CRF-1995-570, of Murder (malice aforethought) in the First Degree (Count I), and three counts of Shooting with Intent to Kill (Counts II, III, and IV). In accordance with the jury's verdict, Petitioner was, on August 6, 1996, sentenced to death. On direct appeal, Petitioner filed an application for evidentiary hearing on his ineffective assistance of counsel claim and the Oklahoma Court of Criminal Appeals found there was a strong possibility trial counsel had been ineffective and remanded the matter to the trial court for an evidentiary hearing. *Taylor v. State*, 972 P.2d 864 (Okla. Crim. App. 1998). Following remand, the Court affirmed Petitioner's conviction and death sentence. *Taylor v. State*, 998 P.2d 1225 (Okla. Crim. App. 2000), *cert. denied*, 531 U.S. 1157, 121 S.Ct. 1109, 148 L.Ed.2d 978 (2001).

On September 24, 1998, Petitioner filed an Application for Post-Conviction relief in the Oklahoma Court of Criminal Appeals, Case No. PC-98-738. On July 17, 2000, in an unpublished opinion, that court denied relief. Petitioner now seeks relief from his death sentence pursuant to 28 U.S.C. § 2254.

As a preliminary matter the Court notes that Marty Sirmons is currently the Warden at Oklahoma State Penitentiary. The Court finds, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Marty Sirmons is the proper substituted Respondent and the Court Clerk shall be directed to note such substitution on the record. Further, pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases, 28 U.S.C., the Attorney General is not Petitioner's custodian and should, therefore, not be listed as a party to this proceeding.

## I. RECORDS REVIEWED

This court has reviewed (1) the Petition for Writ of Habeas Corpus; (2) the Response to the Petition; (3) the Reply to the Response; (4) the transcript of November 6, 1995; (5) transcripts of Preliminary Hearing held on January 10, 1996, Volumes I and II; (6) transcript of Motion for Continuance on March 20, 1996; (7) transcript of Motion for Continuance on May 6, 1996; (8) transcript of Motion hearings on July 26, 1996; (9) transcript of Jury Trial held on July 29, 30, and 31, 1996, Volumes I - III, including exhibits attached thereto; (10) transcript of February 9, 1999; (11) transcript of Evidentiary Hearing held on February 22 - 23, 1999, Volumes I - IV, including exhibits thereto; and (11) all other records before the Oklahoma Court of Criminal Appeals which were transmitted to this court. Although not

listed specifically, this court has reviewed all items filed in this case. *See* Inventory of State

Court Record, Docket No. 29, filed on July 12, 2004.

As a result, this court finds that the records, pleadings and transcripts of the state

proceedings provide all the factual and legal authority necessary to resolve the matters in the

petition and, therefore, an evidentiary hearing is unnecessary. *Keeney v. Tamayo-Reyes*, 504

U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct.

764, 66 L.Ed.2d 722 (1981)(*Sumner I*); *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71

L.Ed.2d 480 (1982)(*Sumner II*).

## II.  STATEMENT OF THE FACTS

Historical facts found by the state court are presumed correct, unless the petitioner

rebuts the same by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Since Petitioner

has failed to rebut the facts, as set forth by the Oklahoma Court of Criminal Appeals, this

Court hereby adopts the factual findings made by the Oklahoma appellate court.

> In mid-October, 1995, three weeks prior to the commission of the crime, [Petitioner] and Shelia Pelz, [Petitioner's] girlfriend, brought a pouch of methamphetamine paste to the house of Steven Verner, a high school friend of [Petitioner]. [Petitioner] and Verner, who lived near McAlester, had not seen each other for several years. [Petitioner] had learned Verner was a drug dealer and sold the methamphetamine paste to Verner for $1,700.00. Verner gave [Petitioner] $400.00 and agreed to pay [Petitioner] the remainder of the money after he sold the methamphetamine. Verner also allowed [Petitioner] and Pelz to stay in his home until he sold the methamphetamine. About a week later, Verner made another $400.00 payment to [Petitioner] and gave him a 9mm Ruger pistol to hold as collateral. [Petitioner] made several attempts to collect his debt without success.
> Frankie Oss testified he had not seen [Petitioner] in six years when [Petitioner] showed up where Oss was living. [Petitioner] told Oss he was living in Stillwater, but was down to collect a debt from Verner and was

staying at Verner's home. The night before the shootings, [Petitioner] returned to Oss' house with Pelz and two other men. [Petitioner] told Oss the men were going to assist him in getting his money from Verner and showed Oss the 9mm Ruger. The next day around noon, [Petitioner] found Oss at the Mayfair Motel where he had moved the night before. [Petitioner] told Oss he was going to collect his money from Verner, otherwise he might shoot Verner with his own gun if he did not pay. Oss testified he did not take [Petitioner] seriously, but cautioned him about spending the rest of his life in the penitentiary.

Steve Armstrong testified that on November 4, 1995, [Petitioner] and Pelz came to his house. Verner also owed Armstrong money for methamphetamine. Armstrong stated [Petitioner] consumed a 12-pack of beer between noon and nine o'clock. He testified [Petitioner] and Pelz left to go to Verner's to see if Verner had their money. [Petitioner] told Armstrong he was going to "cap the son of a bitch (Verner) so that bitch (Pelz) would shut up and leave him alone."

On the night in question, [Petitioner] went to Verner's home. Verner testified he took [Petitioner] into the kitchen, offered him food and said: Charles, I know I owe you some money. I do plan to pay you the money. Whatever you think the debt is left, I plan to pay you. I don't have any right now, but I am working. I will be getting a check and you'll be the first one I take care of.

[Petitioner] asked how long it would be before he could pay him back and Verner responded that it would be about two weeks. [Petitioner] replied that was not good enough. He looked at Verner as if he was going to cry and said, "I'm worried about it's down to the point of being or not being." Verner stated he reached out in an attempt to console [Petitioner] and to keep him from crying. He then asked [Petitioner], "You mean to tell me they're going to kill me over $800.00?" [Petitioner] shoved Verner away, pulled a pistol from inside his shirt and shot Verner in the mouth.

Verner then heard two more shots and thought [Petitioner] had committed suicide in the next room. However, these shots were the ones that eventually killed his friend Michael Sauer who was in the living room watching television. Verner then heard his daughter Lindsay scream, "Daddy, Daddy, help me" and ran into the front room and found Lindsay shot and lying on the floor. Verner looked out the front door of the house and saw [Petitioner] shoot Adrianne N. Smith twice.

Lindsay testified she believed Pelz's car had backfired when she heard the shots. Lindsay exited Pelz's vehicle where she was sitting with her friend Adrianne and started toward the house when she saw [Petitioner] emerge waving a pistol. She attempted to run into the house. As she passed, Lindsay

heard him say, "I hope you die, bitch" and then [Petitioner] shot Lindsay in the side of her head.

Adrianne exited the vehicle and began to run away from the house. When she saw [Petitioner] shoot Lindsay, Adrianne attempted to return to aid her friend, but [Petitioner] shot her. While she lay on the ground, [Petitioner] shot her again. [Petitioner] then got into Pelz's car and they sped away.

Michael Sauer telephoned to report the shootings and gave a description of [Petitioner], his name and a description of the vehicle. Officers Weeks and Busby apprehended [Petitioner] and Pelz after a police chase.

Pelz stepped out of the driver's side and laid down on her stomach. [Petitioner] stumbled out of the passenger's side and started walking off in the wrong direction. Upon his arrest, [Petitioner] complained he had hurt his finger, but declined to be taken to the hospital.

[Petitioner] testified at trial that before he went to Verner's home, he had consumed alcohol and methamphetamine. He admitted having Verner's loaded gun inside his shirt when he knocked on the door, but said he was going to return it upon payment of the money. He also testified when Verner reached out towards him, he became scared, pushed him back, pulled out the gun from within his shirt, and shot him in the face.

He stated that when Verner grabbed his face and fell to the ground, he flipped out and started running towards the door. While running through the living room, [Petitioner] saw movement out of the corner of his eyes and fired twice in the direction of the movement. Outside, he saw two more people running towards him screaming and just started shooting in their direction. He then got into Pelz's car and drove off. Pelz asked him what had happened, but [Petitioner] said he could not remember.

[Petitioner] could not explain why it scared him when Verner put his arm around him. Further, he could not remember telling Lindsay that he hoped she died. [Petitioner] testified he did not aim as he shot, but the gun was just flailing around and he was shooting it at anyone running towards him. He did not remember telling Oss he was going to kill Verner with his own gun.

*Taylor v. State*, 998 P.2d 1225, 1228 -1230 (Okla. Crim. App. 2000).

Other facts will be discussed as they become relevant.

### III. PETITIONER'S CLAIMS FOR RELIEF

In his Petition for Writ of Habeas Corpus filed herein on November 29, 2001,

Petitioner raises seven (7) grounds for relief. On March 20, 2002, Respondent filed a

5

Response to the Petition for Writ of Habeas Corpus by and through the Attorney General of the State of Oklahoma. Petitioner's alleged errors can be summarized as follows: (1) ineffective assistance of counsel during both stages of trial; (2) victim's impact statement violated his Sixth, Eighth and Fourteenth Amendment rights; (3) the death verdict was coerced in violation of the Sixth, Eighth and Fourteenth Amendments; (4) improper jury instructions violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights; and (5) insufficiency of the evidence to support the avoiding lawful arrest aggravating circumstance.

## IV. STANDARD OF REVIEW

Since petitioner filed his petition in November, 2001, this case is governed by the statute as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See *Lindh v. Murphy,* 521 U.S. 320, 326-327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The AEDPA made significant changes to federal habeas corpus law, specifically delineating the circumstances under which a federal court may grant habeas relief. Title 28, Section 2254(d) now provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court interpreted the above-quoted statute holding, in order for a petitioner to obtain federal habeas relief, the petitioner must first demonstrate that his case satisfies the conditions set by § 2254(d)(1). In interpreting the "contrary to" language of the statute, the Court said the text of § 2254(d)(1) "suggests that the state court's decision must be substantially different from the relevant precedent of this Court." *Id.*, S.Ct. at 1519. The Court went on to hold that a state-court decision will be contrary to clearly established precedent "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court case law or "if the state court confronts a set of facts that are materially indistinguishable from" a decision of the Supreme Court, but nonetheless arrives at a different result. *Id.*, S.Ct. at 1519-1520. In considering the "unreasonable application" language of the statute, the Court held when "a state-court decision unreasonably applies [Supreme Court law] to the facts of the prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause." *Id.*, S.Ct. at 1521. Finally, the Court went on to say: "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*, S.Ct. at 1522.

The AEDPA "increases the degree of deference afforded to state court adjudications." *Moore v. Gibson*, 195 F.3d 1152, 1164 (10th Cir. 1999), *cert. denied*, 530 U.S. 1208, 120

S.Ct. 2206, 147 L.Ed.2d 239. Determinations of factual issues made by state courts are presumed correct and a habeas petitioner must rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

In his first proposition of error, Petitioner contends his counsel was constitutionally ineffective in the second stage of trial for (a) failing to voir dire jurors on the issue of capital punishment; (b) failing to give an opening statement; (b) inadequately preparing his expert witness; (c) failing to properly investigate and use all available mitigation witnesses; (d) giving a weak closing argument; and (e) failing to object to jury coercion.  Additionally, in his fifth proposition of error, Petitioner asserts he was deprived constitutionally effective assistance of counsel during the first stage of trial because counsel failed to support the theory of defense with readily available evidence and committed other errors, including waiving opening statement; cross-examining only four of the thirteen witnesses called by the prosecution; and inadequately preparing for trial.   Respondent argues Petitioner has failed to rebut the factual findings of the trial court at the remanded evidentiary hearing and has failed to establish that the Oklahoma Court of Criminal Appeals adjudication of these issues resulted in a decision that was either contrary to or an unreasonable application of relevant Supreme Court precedent.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court enunciated the legal standards which apply to claims of ineffective assistance of counsel in a criminal proceeding.  First, the Court indicated that the

defendant must establish that the representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms. In order to establish that counsel's performance was deficient, Petitioner must establish counsel made errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. The purpose of the Sixth Amendment's guarantee of effective assistance of counsel is to ensure that criminal defendants receive a fair trial. *Id.*, 466 U.S. at 689, 104 S.Ct. at 2065. Second, the defendant must establish that the deficient performance prejudiced the defense. *Id.*, 466 U.S. at 687, 104 S.Ct. at 2064. Failure to establish either prong of the *Strickland* standard will result in a denial of Petitioner's Sixth Amendment claims. *Id.,* 466 U.S. at 696, 104 S.Ct. at 2069-2070.

While ensuring that criminal defendants receive a fair trial, considerable judicial restraint must be exercised. As the Supreme Court cautioned in *Strickland*,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.*, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted).

In deciding whether counsel was ineffective, a court must judge the reasonableness of the challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. It is the responsibility of a defendant attacking an attorney's assistance to identify the particular acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment and then the court must determine, in light of all of the circumstances, whether the identified acts were outside the wide range of professionally competent assistance. *Id.*, 466 U.S. at 690, 104 S.Ct. at 2066.

In considering Petitioner's claims of ineffective assistance of counsel on direct appeal, the Oklahoma appellate court first remanded the case to the trial court for the purpose of conducting an evidentiary hearing on two of the ten claims[2] raised by Petitioner, to-wit: (1) whether trial counsel was ineffective for failing to employ psychologist Bill Sharp earlier in his trial preparation, and once employed, whether counsel failed to maximize Dr. Sharp's expert assistance, and (2) whether counsel was ineffective in failing to adequately prepare for trial and in failing to call second stage mitigation witnesses. In addition to ordering the trial court to conduct an evidentiary hearing, the appellate court also ordered the trial court

---

[2]The ten claims of ineffective assistance of counsel raised by Petitioner on direct appeal were: (1) failure to make opening statements, to file significant motions, to cross-examine key witnesses effectively, to make significant objections, and to make significant closing arguments; (2) failure to present available evidence to support guilt phase defense, to cross-examine in support thereof, and to make effective arguments to the jury in support thereof; (3) failure to use defense of depraved mind murder in the second degree; (4) closing arguments were fundamentally and prejudicially deficient; (5) failure to use impeachment evidence against Lindsay Verner; (6) failure to object to supplemental instructions on issue of life without parole and jury deadlock; (7) failure to seek discovery of Verner's pistol; (8) failure to prepare the Petitioner adequately for testifying and did not match purpose of his testimony with appropriate stage of trial; (9) failure to seek change of venue; and (10) failure to call other available mitigation witnesses besides Dr. Sharp. *See*, *Taylor v. State*, 998 P.2d 1225, 1233-34 (Okla. Crim. App. 2000).

to submit written findings of fact and conclusions of law. *Taylor v. State*, 972 P.2d 864 (Okla. Crim. App. 1998). Thereafter, in affirming Petitioner's conviction and sentence, the appellate court found the trial court's findings and conclusions were supported by the record. *Taylor v. State*, 998 P.2d 1225, 1234 (Okla. Crim. App. 2000).

As indicated previously, historical facts found by the state court are presumed correct, unless the petitioner rebuts the same by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Since Petitioner has failed to rebut the facts, as set forth by the trial court and adopted by the Oklahoma Court of Criminal Appeals, this Court hereby relies upon the factual findings of the trial and appellate courts in consideration of Petitioner's ineffective assistance of counsel claims. In determining whether the challenged acts and omissions of counsel were outside the wide range of reasonable professional conduct, this Court finds the following factual findings of the trial court significant.

> The Court concurs with the State that Karen Billing[3] is not credible. She is a witness not worth (sic) of belief or credit. The main thrust of her testimony is that she disagreed with Mr. Tom Elliott's trial strategy, she thought the case should be handled differently but admits it is up to the attorney to make the decisions. She complains in her Affidavit that the defendant wasn't adequately prepared to testify. Yet no testimony or evidence was offered to support that allegation.
>
> In addition, Ms. Billing has previously been found to not be worthy of belief in a capital case in this Judicial District by District Judge Steven W. Taylor, in State of Oklahoma v. Scott Dawn Carpenter, F-94-18 in McIntosh County on February 7, 1995.
>
> It is important to note that the Oklahoma Indigent Defense System employed John Thomas Elliott and continued his employment until he

---

[3]At the time of trial, Karen Billing was the investigator for the Oklahoma Indigent Defense System who was assigned to this case. *See* State of Oklahoma's Proposed Findings of Fact and Conclusions of Law, which were adopted by the trial court, at p. 4. See also, Transcript of Evidentiary Hearing, held on February 22, 1999, hereinafter Evid.Hrg.Tr., Vol. I at pp. 66-67.

voluntarily left in January, 1999 and continues to employ Karen Billings. It would appear that OIDS doesn't believe their own position of incompetence of counsel and insufficient preparation since OIDS continued to employ Mr. Elliot and continues, to this day, to employ Ms. Billings. Surely, OIDS would not have continued to employ Mr. Elliot and Ms. Billings to defend and investigate capital cases, if they were as grossly incompetent in this case as OIDS now claims.

Dr. Bill Sharp's basic testimony was essentially the same at the Evidentiary Hearing as it was at trial. His opinions and diagnosis did not change. Dr. Sharp seemed at times, from his responses and demeanor, to have taken the jury's verdict of death personally. He appeared to be offended that the District Attorney tried to attack his credibility. The jury heard the evidence of all the witnesses, observed their demeanor and exercising their collective sense, chose not to surrender their opinion to Dr. Sharp's expert opinion. Jurors have that option under the Instructions.

The Court tried the jury trial and obviously observed John Thomas Elliott's trial presentation. Mr. Elliott had a very difficult case to handle. Mr. Elliott had to represent a defendant who had gone to a residence armed with a semi-automatic pistol, to collect drug/methamphetamine money. The jury saw the witnesses and heard their testimony. The jury heard that Michael Sauer was shot twice in the back, that the defendant had shot his friend, Steve Verner, in the mouth, and had shot two young girls. One of whom, Lindsey Verner, testified the defendant said "I hope you die bitch" just prior to shooting her in the head. As Mr. Elliott testified this was not a "who done it" case.

Mr. Elliott testified why he handled the case in the manner he did. Mr. Elliott's trial strategy was sound under these difficult facts. Mr. Elliott's job was made all the more difficult by the defendant's complete lack of remorse or emotion. Mr. Elliott's unrefuted testimony was that he discussed with Mr. Taylor his plan for him to testify and adequately advised him regarding his testimony.

The Court will never forget the demeanor and lack of remorse and emotion f (sic) the defendant during the trial and even during the Evidentiary Hearing. The jury observed Mr. Taylor's demeanor and lack of emotion during the trial. They also observed his lack of remorse on the witness stand. An attorney cannot make a client show remorse, especially if the client has none. It is important to note that Mr. Taylor did not testify at the Evidentiary Hearing regarding his lack of preparation to testify at trial. He made no complaint on the issue of his preparation as a witness.

Mr. Elliott's efforts on Mr. Taylor's behalf were complicated by Mr. Taylor's refusal to testify in the second stage, and his inability to have the

defendant's mother testify because she did not believe her son had committed the crimes in spite of his testimony. Thus his second stage presentation was limited to Dr. Sharp. Dr. Sharp testified at length about Mr. Taylor's drug and alcohol abuse and intoxication on the day of the murder in an effort to obtain a sentence less than death. The bottom line is the jury didn't accept it over the evidence they had already heard.

Trial Court's Findings of Fact and Conclusions of Law filed on April 28, 1999, in the

Oklahoma Court of Criminal Appeals Case No. F-96-1102, at pp. 2-4 (footnote added). In

addition, in adopting the State of Oklahoma's Proposed Findings of Fact and Conclusions

of Law, which were incorporated by reference and attached to the Trial Court's Findings of

Fact and Conclusions of Law, the trial court found the following facts which, when

considering the totality of the circumstances, are also important in deciding whether or not

Petitioner was deprived of a fundamentally fair trial.

Mr. Elliott testified that he began practicing law in Oklahoma in 1966. He served as an assistant district attorney in Ottawa County from 1966 to 1968. He served as an assistant district attorney in Mayes County from 1968 to 1970. He was in private practice from 1970 to 1972. From 1972 to 1974, he was commissioner of narcotics and dangerous drugs for the State of Oklahoma. From 1974 to 1976, he served as an assistant public defender. In 1976, he served as an assistant district attorney in Oklahoma County. In 1977 he became chief public defender for Oklahoma county (sic). He then served as an assistant district attorney in Oklahoma County again until 1980. He then became the executive director of the district attorney's association. In 1981, he became first assistant in the Oklahoma County district attorney's office. He later went into private practice in Oklahoma City from approximately 1982 until 1992. In 1992, he became the patient advocate general with the Department of Mental Health. He then went back into private practice. In 1995, he went to work for the Oklahoma Indigent Defense System, Capital Trial Division. During his times in private practice, he handled criminal defense cases. . . . . . . the sum of his testimony was that he felt he was prepared to go to trial. He felt that an adequate investigation of the matter had been conducted, especially in light of the fact that the case was not a "who done it". He did not feel his caseload prevented him from doing an adequate

job in this matter. He met with his client and felt he had adequately prepared him to testify. The most important part of the testimony was for the defendant to express remorse. He had stressed this to the defendant. When the defendant took the stand, he did not express remorse. He was frustrated by this, but did not (sic) angry. He stated that it was an insult for anybody to "even intimate that I would go under the bus or throw a client under the bus". In his time with OIDS, he tried seven or eight capital cases. He also defended capital cases when he was in private practice.

Mr. Elliott did not review any documents to refresh his memory for this hearing.[4] He felt to do so would only serve to work against the defendant, as he believed such a review would refresh his memory and convince him even further that he had performed competently.

Mr. Elliott could not remember the details of hiring Mr. Sharp. However, it was never his intent to put Mr. Sharp on the stand in the first stage. This was a trial strategy decision made by him. Due to the fact his client admitted that he had committed the shootings, he felt the main issue of the case was credibility and mitigation. His strategy was that the defendant's testimony was factually in line with many of the State's witnesses, which he felt would give the defendant credibility as a witness. His defense would be to argue that the defendant had no knowledge of the deceased and shot him as a reflex, thus eliminating malice aforethought. In the second stage, if one was necessary, he would then put on Mr. Sharp to mitigate the acts through the defendant's drug dependency.

After the jury returned a guilty verdict, the defendant refused to testify again. Additionally, Mr. Elliott feared putting the defendant's mother on the stand, as it was her opinion that her son was not guilty and had not committed the crimes. To deal with these surprises, Mr. Elliott decided not to place any "ancillary" mitigation witnesses on the stand such as friends and co-workers. His reasoning was that if he called none of these, and called only the psychiatrist, the jury might not realize that the defense could call family members or the defendant. He thus hoped to avoid highlighting the fact that neither the defendant nor his mother was taking the stand. He felt he obtained the testimony from Mr. Sharp that was needed, and did not feel that it was hindered by the late hiring of the witness.

---

[4] Reference to the evidentiary hearing held on February 22 and 23, 1999.

State of Oklahoma's Proposed Findings of Fact and Conclusions of Law, at pp. 7-9 (footnote added). Additional findings of fact will be discussed as they become relevant to the resolution of the issues herein.

## A. Failure to voir dire on capital punishment

Petitioner begins his first proposition by stating counsel's "ineffective representation began with a lack of pretrial preparation, followed by a failure to voir dire on death penalty issues . . . . . ." *See*, Petition at p. 10. Petitioner then spends three and a half pages arguing trial counsel's "failure to voir dire is another example of his pervasive failure to provide effective advocacy against the death penalty." *Id*., at pp. 24 - 27. Prior to seeking redress via federal habeas review, a petitioner generally must exhaust available state court remedies. *See*, 28 U.S.C. § 2254(b)(1). Exhaustion is not, however, required if an attempt to exhaust would be futile. *James v. Gibson*, 211 F.3d 543, 550 (10th Cir. 2000). If Petitioner now sought to raise this issue in a successive post-conviction application, the Oklahoma Courts would clearly find the claim procedurally barred. *See*, *Taylor v. State*, Case No. PC-98-738, Order Denying Application for Post-Conviction Relief and Request for Evidentiary Hearing in which the Court states at page 2, "This Court will not consider an issue which was raised on direct appeal and is therefore barred by *res judicata*, nor will this Court consider an issue which has been waived because it could have been raised on direct appeal but was not." (footnotes omitted). *See also*, 22 O.S. § 1089. Although Petitioner raised the issue of ineffective assistance of counsel both on direct appeal and in his first post-conviction application, he based his claim on different grounds. Petitioner did not, in either instance,

complain that counsel was ineffective for failing to voir dire on capital punishment. Thus, Petitioner has failed to exhaust this particular ineffective assistance of counsel claim. *See, Lambert v. Blackwell*, 134 F.3d 506, 517 (3d Cir.1997) (finding ineffective assistance of counsel claim unexhausted when petitioner asserted a different basis for the claim in the state courts than presented in his habeas petition), *cert. denied*, 532 U.S. 919, 121 S.Ct. 1353, 149 L.Ed.2d 284 (2001); *Lanigan v. Maloney*, 853 F.2d 40, 45 (1st Cir.1988) (same), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 789 (1989); and *Demarest v. Price*, 130 F.3d 922, 938-39 (10th Cir. 1997) (finding claims unexhausted when petitioner made general allegations of ineffective assistance of counsel in state court and more specific allegations in federal court on habeas). However, dismissal without prejudice for failure to exhaust state remedies is not appropriate if the state court would now find the claims procedurally barred on independent and adequate state procedural grounds. *See Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Demarest*, *supra* at 939.

There can be no doubt if Petitioner were to return to state court and filed a second post-conviction application on this new allegation of ineffective assistance of counsel, he would be procedurally barred either by *res judicata* or waiver. As a result, this Court will treat this claim as if it were procedurally barred. *See*, *Moore v. Reynolds*, 153 F.3d 1086, 1097 (10th Cir. 1998), *cert. denied*, 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 362 (1999). Since Petitioner has failed to show cause for not raising this particular claim of ineffective assistance of counsel in his first application for post-conviction relief and his petition herein does not contain a colorable showing of factual innocence, he cannot demonstrate that failure

of this Court to review this particular ineffective assistance of counsel claim will result in a fundamental miscarriage of justice. *See Hickman v. Spears*, 160 F.3d 1269, 1275 (10th Cir. 1998) and *Smallwood v. Gibson*, 191 F.3d 1257, 1266-1269 (10th Cir. 1999). Accordingly, this Court finds this particular claim of ineffective assistance of counsel is procedurally barred and not subject to habeas review.[5]

## B. Failure to use available mitigation witnesses and inadequate preparation of expert

The rest of Petitioner's first ground for relief focuses on trial counsel's second stage performance. Specifically, Petitioner asserts counsel was ineffective for failing to use available mitigation witnesses and for inadequately preparing and using Dr. Bill Sharp, the defense expert witness. Respondent argues Petitioner has failed to establish that the Oklahoma appellate court's adjudication of Petitioner's ineffectiveness claims resulted in a decision that was contrary to or involved an unreasonable application of Supreme Court jurisprudence or that it involved an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Since the adversarial testing process will not generally function properly unless defense counsel has conducted reasonable investigations into matters related to the sentencing phase of trial, counsel has a duty to undertake reasonable investigations or to make reasonable decisions that make particular investigations unnecessary. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting *Strickland*,

---

[5] Based upon the individual voir dire conducted by the trial court regarding the death penalty, even if this claim were reviewable, this Court would not find trial counsel was ineffective for failing to ask additional questions on this issue. *See*, J.T.Tr., Vol. I, at pp. 7-219 and in particular pp. 174-218.

466 U.S. at 691, 104 S.Ct. 2052). *See also*, *Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001). Trial counsel must investigate the existence of potentially mitigating evidence, before making any tactical decision regarding whether or not to present any of the mitigating evidence discovered. *Stouffer v. Reynolds*, 168 F.3d 1155, 1167 (10th Cir. 1999). "[A]n attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances." *Breechen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir. 1994).

Petitioner first raised these issues in his direct appeal. In denying relief, the Oklahoma Court of Criminal Appeals identified *Strickland* as the appropriate federal law applicable to Petitioner's case, holding:

> To prevail on a claim of ineffective assistance of counsel, [Petitioner] must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). (Citation to Oklahoma caselaw omitted) One alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. *See also Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct6. 838, 122 L.Ed.2d 180 (1993). If this court can dispose of an ineffective assistance of counsel claim on lack of prejudice, we need not determine whether counsel's performance was deficient. (citations omitted) We have also held that we will not second guess counsel's trial strategy. (citations omitted)
>
> At the evidentiary hearing, trial counsel articulated his trial strategy, stating the case was not a "who done it" case and, without dispute, [Petitioner] was under the influence. Trial counsel believed the fact [Petitioner] did not know Michael Sauer "fit right into the fact" that [Petitioner] really had no motive to kill him. His long range strategy was to be credible and to be consistent. Trial counsel stated his strategy was "trying to escape specific intent factually and testimonially" and to rise and fall on "[o]ur credibility and

the ability of the jury to see that a man that's on drugs--had been on them--a long-running history with them-could make a mistake and could be screwed up on a given day and make a bad mistake."

Trial counsel testified he did not use his expert witness as a first stage witness as part of his trial strategy because he felt it would diminish the testimony to put it on at both stages. Additionally, trial counsel testified the defense raised in the trial was not voluntary intoxication in the "literal, absolute sense." Trial counsel's defense was to eliminate malice aforethought by arguing the defendant had no knowledge of the deceased and shot him as a reflex. Trial counsel testified he put on Dr. Sharp during second stage to mitigate [Petitioner's] acts through his drug dependency.

* * * * * * *

We next address [Petitioner's] claim regarding trial counsel's misuse of and failure to fully utilize the defense's sole expert witness Dr. Bill Sharp, a clinical psychologist and Executive Director of the Norman Alcohol and Chemical Dependency Center. This was one of the issues remanded for evidentiary hearing. At the evidentiary hearing, the testimony established that trial counsel made "an emergency request" of Dr. Bill Sharp to provide expert assistance in this case. Trial counsel did not specify how he wanted to utilize Dr. Sharp. Dr. Sharp was not provided with prior records which would have corroborated information provided him by [Petitioner]. Dr Sharp was still administering tests to [Petitioner] on the first day of trial. He wrote his report on the second day of trial and faxed it to trial counsel. Dr. Sharp met with trial counsel on the third day of trial after the first stage. Dr. Sharp testified, "[i]t was not until I came down and participated in the trial [that I understood the terms first and second stage]. And then after the fact, I wondered to myself why I hadn't been used earlier." Dr. Sharp testified that had he been utilized, he could have provided information tending to prove [Petitioner] "did not have the capacity to form the intent in terms of committing the murder."

At the evidentiary hearing, Dr. Sharp provided substantial testimony on the effects of alcohol, methamphetamine, and cannabis, singly and in combination. Additionally, he related the witnesses' accounts of [Petitioner's] behavior at the time of the offenses with the medically described symptoms of acute methamphetamine intoxication. Dr. Sharp described one such symptom as disassociation, wherein "[t]he individual would remember details of the events. But because of the delusions they're experiencing, the impulsivity, the sense of just reacting and not planning, they wouldn't understand why they were doing what they were doing. They would remember it, they just wouldn't understand why."

Trial counsel testified at the evidentiary hearing that, despite the lateness of Dr. Sharp's hiring, he never felt he was unable to get what he

wanted from Dr. Sharp and he never considered using Dr. Sharp as a first stage witness. It was part of his trial strategy not to do so, because it would diminish his testimony to put it on at both stages. When asked if it occurred to him that Dr. Sharp's expertise might be of use in establishing a voluntary intoxication defense, trial counsel stated he did not recall. With regard to utilizing Dr. Sharp to establish the lack of premeditation, trial counsel stated it must not have occurred to him or he would have called Dr. Sharp. However, trial counsel testified he did not think the testimony of an expert such as Dr. Sharp regarding the effects of drugs on the brain and behavior would have any impact on *mens rea* in the guilt/innocence phase of trial. In view of trial counsel's belief that using Dr. Sharp in the first stage would diminish his testimony in the second stage, we find trial counsel's strategic choice not to use Dr. Sharp in the first stage of trial to be reasonable.

Next, a review of the record reveals that during the second stage of trial, the prosecutor moved for adoption of the first stage evidence without objection and Dr. Karl Sauer, the murder victim's father, was allowed to give a victim impact statement. [Petitioner's] sole mitigation evidence came from the testimony of Dr. Bill Sharp. He testified during second stage from the report of his findings. Those findings included that [Petitioner] took his first drink of alcohol at the age of five or six years old and that he was drinking every weekend by the time he was a teenager. From the age of twenty-one, [Petitioner] was drinking on a daily basis. Over a period of twelve to fourteen years, [Petitioner] was arrested for D.U.I. six times. [Petitioner] began to ingest methamphetamines at age twenty-one and was soon injecting himself daily.

Dr. Sharp testified [Petitioner] suffered from blackouts, was clearly chemically dependent on alcohol, amphetamines, and marijuana, and would remain so for the rest of his life. He also testified that the three injections of methamphetamine [Petitioner] took on the day of the shootings resulted in acute amphetamine intoxication based on a near poisonous dose. Dr. Sharp stated that when this happens, individuals go past paranoia into a very intense state of aggression and suspicion. He stated "their behavior is violent and in short they're a walking time bomb."

Dr. Sharp added that consuming whiskey and injecting amphetamines can cause volatile mood changes from one minute to the next without explanation and causes people suffering from these effects to have an extra sensitive startle response or reflex. He characterized [Petitioner] as having clinical borderline depression, being guilty and full of remorse, and as not having been competent when he committed the crime. He expressed great hope for [Petitioner's] rehabilitation.

We find Dr. Sharp's second stage testimony to be substantially the same as his testimony at the evidentiary hearing. Had the jury been persuaded by

Dr. Sharp's testimony that [Petitioner's] acute intoxication would have negated his ability to form the specific intent to kill or that such acute intoxication so sensitized his startle reflex, we believe the jury would not have imposed the death penalty but would have arrived at a 'compromise" verdict. (Citation omitted) Considering the jury's imposition of the sentence of death, we additionally find Dr. Sharp's testimony would not have affected the outcome of the first stage.

\* \* \* \* \*

[Petitioner] next claims that trial counsel was ineffective for failing to call additional available mitigation witnesses in second stage. This claim was remanded for evidentiary hearing. At the evidentiary hearing, ten witnesses testified. Five of them ([Petitioner's] sister, nephew, paternal aunt, former supervisor at Frontier Engineering and a friend of sixteen years) were subpoenaed and available at trial, but were not called to testify. Two other witnesses (a former co-worker and girlfriend, and a Christian minister) were contacted and expressed a willingness to testify, but were not ever subpoenaed. The other three witnesses who testified at the evidentiary hearing were never contacted, but stated they would have testified if asked. These witnesses were a former supervisor and two individuals who were formerly supervised by [Petitioner]. Each of these witnesses would have testified to evidence of [Petitioner's] character much different from the person who was under the influence of an alcohol-drugs combination and/or suffering from acute methamphetamine intoxication.

Trial counsel stated his decision not to use mitigation witnesses was influenced by two factors beyond his control: 1) [Petitioner's] refusal to testify in the second stage and 2) [Petitioner's] mother's attitude which was "one of failure to accept responsibility for this." Trial counsel testified at the evidentiary hearing that he felt calling "a bunch of ancillary relatives, employees, co-employees, or employer that were going to say things like, '[h]e was a good friend of mine,' only pointed out the absence of his mother and him on the stand in my mind." When asked if he had any idea what these witnesses would have testified to if utilized, trial counsel state he "[d]idn't care what any of the say (sic)." Again, he reasoned that by not putting on any lay witnesses, the jurors might think that only an expert testifies in second stage and other people are not called to testify. Trial counsel added that he would not have put on witnesses who would testify they used drugs with [Petitioner], because he did not see how that would benefit [Petitioner's] case.

Under these circumstances, where [Petitioner] admitted he committed the offenses, apparently without much remorse, while under the influence of a drug/alcohol combination and where trial counsel believed [Petitioner's] mother still did not believe he committed the offenses, we find trial counsel's

decision to present only his expert witness was a reasonable second-stage strategy. Having found trial counsel's decisions to be consistent with his trial strategy, [Petitioner's] claim of ineffective assistance of counsel is denied.

*Taylor v. State*, 998 P.2d 1225, 1234-1237 (Okla. Crim. App. 2000).

After carefully reviewing the records herein, this Court is convinced that this case is a perfect example of the dangers foreseen by the Supreme Court in *Strickland* in allowing a defendant or his subsequent counsel to conduct intrusive post-trial inquiries into an attorney's performance in an attempt to secure a new trial. Unlike the facts involved in *Williams v. Taylor*, 529 U.S. 362, 395-399, where testimony indicated counsel did not begin to prepare for the second phase of trial until a week before the trial and as a result, failed to find extensive records of his client's abuse as a child or that his client was "borderline mentally retarded," Petitioner admits substantial investigation had been conducted by defense counsel and/or his investigator on his behalf before the trial began. Furthermore, the records herein support a finding that trial counsel had an investigator who was working at his direction. Numerous second stage witnesses were contacted and interviewed prior to trial. According to Karen Billing's testimony her investigation concentrated on the mitigation stage. Counsel assigned the investigator the responsibility of locating an expert witness sometime in late June, but no one the investigator contacted was available for the July trial setting. So, defense counsel personally contacted Dr. Sharp in mid-July. Evid.Hrg.Tr., Vol. I, at pp. 70-73. After hearing the testimony regarding the late hiring of a defense expert, the trial court specifically found:

The testimony of OIDS investigator Karen Billing was that she was attempting to obtain an expert witness for the defense, but was unable to find one. She then reported this to Mr. Elliott, and he arranged for Mr. Sharp to be the expert witness in the trial. Mr. Elliot testified that he did not recall if he was the person who eventually contacted Mr. Sharp, but it was possible that he did.

Mr. Elliott testified that he did not think that time hindered the testimony he was able to attain from Mr. Sharp. He testified that he got what he felt he needed for the trial. Mr. Sharp testified that he felt that he was able to make a correct diagnosis in this case. Mr. Sharp was unable to sufficiently explain how his being hired earlier would have significantly changed his testimony or services. Mr. Sharp testified that he estimated that he would need 25 hours to provide the services needed, but completed the services in only 20 hours. Thus, it is clear that he did not run out of time.

State of Oklahoma's Proposed Findings of Fact and Conclusions of Law at pp. 9-10, adopted and incorporated by reference and attached to the Trial Court's Findings of Fact and Conclusions of Law filed on April 28, 1999, in the Oklahoma Court of Criminal Appeals Case No. F-96-1102. Additionally, as pointed out in Petitioner's Petition,

As the second stage of Mr. Taylor's trial began, a group of witnesses were waiting in the hallway outside the courtroom. They had been subpoenaed by the defense and were prepared to inform the sentencing jury about the life of Charles Taylor. In fact, the defense listed a total of eighteen potential mitigation witnesses prior to trial. O.R. 116-118, 153-154.

Petition, at p. 7. The record reflects the defense investigator had spoken with all of the witnesses subpoenaed by Petitioner and had discussed the possible testimony of these witnesses with trial counsel approximately two weeks prior trial. Evid.Hrg.Tr., Vol. I, at pp. 74 - 75. While trial counsel may not have remembered, and really didn't care at the evidentiary hearing conducted more than two years after trial, what the mitigation witnesses would have said, it is clear that he was aware of the potential mitigating evidence available

to him prior to making a decision as to whether or not to present any of the mitigating evidence discovered.

Counsel, however, based upon his extensive capital litigation defense experience, had developed a viable defense, *i.e.* that Petitioner did not possess the requisite malice aforethought for first degree murder because he did not know the victim, did not have any dealings with the victim and therefore, did not have any reason to kill the victim. This defense rested, however, upon the Petitioner's credibility and his expression of remorse. Counsel met with the Petitioner and felt he had adequately prepared him to testify. However, when the Petitioner took the stand, he did not express remorse. Faced with factors beyond his control, *i.e.*, the Petitioner's lack of remorse and refusal to testify in the second stage[6] combined with Petitioner's mothers unwillingness to acknowledge her son's actions and who would have testified that the jury had convicted the wrong person, counsel was forced to make a trial strategy decision, which was clearly not based on lack of preparation. His decision was to not put on other available mitigation witnesses who would have either testified Petitioner did not or would not have committed the crimes charged if he had not been under the influence of drugs. This Court finds his decision was a reasoned trial strategy, especially in light of the fact the jury had already heard during the first stage of trial, testimony regarding petitioner's intoxication and had rejected the notion that, during these crimes, Petitioner was so intoxicated that he could not have formed the specific intent to kill

---

[6] Based on the testimony at the evidentiary hearing, it is clear counsel did not make his decision to not call the available mitigating witnesses until after being advised by Petitioner that Petitioner would not testify during the second stage of trial. Evid.Hrg.Tr., Vol. IV, at p. 81.

the victim. Since the state did not put on any additional evidence in support of the aggravating circumstances during the second stage of trial, counsel's decision to only call an expert witness during the second stage was a reasonable plea for mercy under the facts of this case. Again, this Court would note, as the Supreme Court in *Strickland* recognized, there are many different ways to defend a particular client and provide effective assistance of counsel. While other strategies might have impacted the jury differently, that is not what this Court must decide. Rather, this Court must decide if counsel's strategy, evaluated from the perspective of counsel at the time of trial, falls within the wide range of reasonable professional assistance.

Further, even if this Court were to find counsel's decisions were unreasonable, based upon the totality of available mitigation evidence - both that adduced at trial, as well as the testimony presented at the evidentiary hearing in state court which Petitioner claims should have been admitted as mitigating evidence during the second stage of trial - reweighed against the substantial amount of evidence heard by the jury in support of the aggravating circumstances, this Court finds Petitioner has failed to establish prejudice. Specifically, the jury heard that Petitioner had gone to a residence armed with a semi-automatic pistol, to collect drug/methamphetamine money. The jury heard that Petitioner shot Michael Sauer twice in the back after he had shot his friend, Steve Verner, in the mouth, and then he shot two young girls. One of those girls, Lindsey Verner, told the jury that Petitioner said "I hope you die bitch" just prior to shooting her in the head. In addition, the jury heard Dr. Sharp testify that Petitioner had a serious drug/alcohol addiction which could cause volatile mood

changes and might lead to an extra sensitive startle response or reflex. Since the potential effects of drug and alcohol abuse were consistent with Petitioner's description of his actions on the day of the shootings, Dr. Sharp's testimony provided the jury with some solid evidence to mitigate Petitioner's actions if they chose to do so. Many of the other potential witnesses would have negated any mitigation benefit derived from Dr. Sharp's testimony and/or would have conflicted with Petitioner's own testimony during the first stage of trial and Dr. Sharp's testimony as to the extent and duration of Petitioner's drug/alcohol addiction. *See*, State of Oklahoma's Proposed Findings of Fact and Conclusions of Law, *supra*, at pp. 19 - 30.[7] To put on witnesses to contradict Petitioner's own testimony could not have helped Petitioner's case in any way and counsel would have been ineffective if he had called the witnesses Petitioner now claims should have been called to testify. Additionally, this Court is mindful that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, *supra*, 466 U.S. at 691, 104 S.Ct. at 2066. A review of the record herein makes it clear that counsel's actions were clearly influenced by the defendant's own statements and actions, including his lack of remorse and refusal to testify in the second stage of trial

## C. Waiver of Opening Statement and Anemic Closing Argument

Petitioner next complains that counsel's waiver of opening statement, during the second stage of the proceedings, and his anemic closing argument left the defendant with

---

[7]All of the witnesses which Petitioner now claims would have presented compelling mitigation evidence testified at the state court evidentiary hearing and Petitioner has failed to rebut the state court's factual findings regarding each of these witnesses' testimony concerning the extent and duration of Petitioner's drug and/or alcohol addiction.

only a warm body to stand next to him during a critical stage of the proceedings.  A review of the entire record, however, convinces this Court that, in light of Petitioner's own actions, there was nothing else counsel could have done to maintain credibility with the jury, especially if there was any chance that Petitioner might change his mind before the second stage was concluded and agree to testify.[8]  Furthermore, the fact counsel's presentation initially hung the jury shows counsel's "simple plea for mercy"[9] was not necessarily an unreasonable strategy especially in light of the horrific crime the jury had just found Petitioner guilty of committing.  To hold otherwise would require this Court to engage in the very hindsight which the Supreme Court has expressly forbidden.  *See*, *Strickland*, *supra*, 466 U.S. at 689, 104 S.Ct. at 2065.

## D.  Failure to object to jury coercion

Next, Petitioner asserts trial counsel's failure to object to jury coercion resulted in his receiving ineffective assistance of counsel.  Since this Court does not believe the jury instructions coerced the jury to reach a verdict of death, for the reasons set forth in section VII of this opinion, this Court finds counsel was not ineffective for failing to object to jury coercion.

## E.  First stage performance

---

[8]The evidentiary hearing reveals counsel spoke with Petitioner, prior to the second stage, and Petitioner personally advised counsel he would not testify in the second stage.  Evid.Hrg.Tr., Vol. IV, at p. 17.  While counsel was frustrated with this decision, it appears counsel then asked the investigator to speak with Petitioner and try to convince him to testify.  Evid. Hr.Tr., Vol. I, at p. 80.

[9]Petitioner's Petition at p. 7.  *See also*, closing argument of trial counsel (J.T.Tr., Vol. III, at pp. 775 - 776).

The heading of Petitioner's fifth ground for relief makes it clear Petitioner is alleging he received ineffective assistance of counsel in the first stage of trial. Some of the arguments made in this proposition, however, seem to be a re-assertion of the claims argued to support ineffectiveness of counsel in the second stage of trial. In particular, Petitioner asserts he was denied effective assistance of counsel because trial counsel failed to support his theory of defense with readily available evidence, *i.e.* he failed to call Dr. Sharp during the first stage of trial and failed to provide Dr. Sharp with additional information to support his opinion[10] and that counsel committed various other errors, including waiving opening statement, cross-examining only four of 13 witnesses called by the prosecution during the first stage of trial, failing to tell the jury the theory of defense until closing statement all of which establish failure of counsel to be an advocate for Petitioner. Again, Respondent asserts Petitioner has not shown that the state court's adjudication of this claim is contrary to or involved an unreasonable application of relevant Supreme Court jurisprudence.

The main thrust of Petitioner's argument is that Petitioner was ineffective for failing to call Dr. Sharp in the first stage of trial and in failing to provide Dr. Sharp with additional information to support Dr. Sharp's conclusions. While the Oklahoma Court of Criminal Appeals considered trial counsel's opinion that the testimony of an expert such as Dr. Sharp regarding the effects of drugs on the brain and behavior would not have an impact on the *mens rea* element required for conviction in the first stage of trial in finding counsel's

_____

[10]This information consisted of the preliminary hearing testimony of Steven Verner and the testimony during the first stage of trial of Verner and Steven Armstrong.

decision not to utilize Dr. Sharp during the guilt/innocence of trial was reasonable, it is clear based on Oklahoma law Dr. Sharp's opinion regarding Petitioner's drug/alcohol addiction would not have been admissible to establish Petitioner was too intoxicated to raise a reasonable doubt of his ability to form specific intent.[11]  This is especially true where Dr. Sharp was not present at the scene of the crime and had no first hand knowledge as to whether Petitioner was or was not intoxicated at the time of the crimes.  To the extent the testimony would have been inadmissible,[12] counsel could not have been ineffective for failing to call Dr. Sharp as a witness during the first stage of trial.

On counsel's failure to give an opening statement and failure to cross-examination more of the State's witnesses, the Oklahoma Court of Criminal Appeals found:

> . . . , [Petitioner] argues trial counsel was ineffective for waiving opening statement at both stages of trial, thereby failing to tell the jury what the defense theory of the case was or to tell the jury why they should spare [Petitioner's] life.  At the evidentiary hearing, trial counsel testified he could not say why he waived opening statement in either stage of trial.  Whether to make an opening statement in any case is a strategic decision counsel must make.  Here, [Petitioner] cannot show that trial counsel's "failure" to make an opening statement was prejudicial or that the decision not to make an opening statement had an outcome on the verdict.
>
> Next, [Petitioner] relies on *Cronic* to support his claim trial counsel was ineffective for failing to cross-examine nine of thirteen witnesses. [Petitioner] argues none of the surviving witnesses were cross-examined despite the availability of impeachment and other credibility evidence.  In particular, he points out evidence going to the credibility of witnesses Steve Armstrong and

---

[11]Under Oklahoma law, a defense of voluntary intoxication is only available if the defendant introduces sufficient evidence to raise a reasonable doubt as to his ability to form the requisite specific intent to kill.  Where a defendant is able to give a lucid detailed account of his past criminal conduct he is deemed unable to raise such a doubt.  *Charm v. State*, 924 P.2d 754, 761, *cert. denied* 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997).

[12]*See Taylor v. State,* 998 P.2d 1225, 1239 (Okla. Crim. App. 2000, Vice Presiding Judge Lumpkin's specially concurring opinion finding "Any testimony by Dr. Sharp as to [Petitioner's] level of intoxication was not relevant . . . . ."

Lindsay Verner. Considering trial counsel's strategy to plea for mercy, his decision not to attack the credibility of an adolescent child victim whom [Petitioner] had shot through the head and the other victims was not deficient performance. Additionally, we find trial counsel's decision not to impeach Steve Armstrong to be consistent with his trial strategy.

*Taylor v. State*, 988 P.2d 1225, 1235 (Okla. Crim. App. 2000) (footnotes omitted).

In order to establish prejudice in the guilt stage, the defendant has to show "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Strickland*, *supra*, 466 U.S. at 694, 104 S.Ct. at 2068. Petitioner appears to be arguing if counsel had called Dr. Sharp at the first stage of the proceedings, there is a reasonable probability that the outcome in the first stage of the proceedings would have been different. Based on the evidence at trial, however, it is abundantly clear that even if counsel had done all of the things which Petitioner claims should have been done, under Oklahoma law, the jury would still have found Petitioner guilty of committing these horrific crimes. Accordingly, this Court can not say that the decision of the Oklahoma Court of Criminal Appeals regarding Petitioner's claims of ineffective assistance of counsel resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law or that the decision was based on an unreasonable determination of the facts.

## VI.  VICTIM IMPACT EVIDENCE

In his second ground for relief, Petitioner asserts his rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the victim's father recommended the jury sentence Petitioner to death. Petitioner raised this issue during direct appeal and the

Oklahoma Court of Criminal Appeals adjudicated the issue on the merits. Respondent argues Petitioner has failed to show that the Oklahoma Court of Criminal Appeals decision was contrary to or involves an unreasonable application of clearly established Supreme Court law, or alternatively, any error in admission of this testimony under state law is harmless.

Even though the challenged evidence was admitted pursuant to 22 O.S. § 984(1)[13], Petitioner asserts Oklahoma's statutes allowing the admission of a victim's sentencing recommendation is unconstitutional under the principles enunciated in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The issue of victim impact evidence has been squarely addressed by the Supreme Court on several occasions. First, in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Court in a 5-to-4 decision held that the Eighth Amendment prohibits a jury from considering a victim impact statement at the sentencing phase of a capital trial. The Court made clear that the admissibility of victim impact evidence was not to be determined on a case-by-case basis, but that such evidence was per se inadmissible in the sentencing phase of a capital case except to the extent that it "relate[d] directly to the circumstances of the crime." Thereafter, in *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), the Court extended *Booth* to include prosecutorial statements to the sentencing jury regarding the personal qualities of the victim.

---

[13]"Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, *and the victim's opinion of a recommended sentence*; . . ." (Emphasis added).

In *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720

(1991), however, the Court overruled *Booth* and *Gathers* holding:

> if the State chooses to permit the admission of victim impact evidence and
> prosecutorial argument on that subject, the Eighth Amendment erects no per
> se bar.  A State may legitimately conclude that evidence about the victim and
> about the impact of the murder on the victim's family is relevant to the jury's
> decision as to whether or not the death penalty should be imposed.  There is
> no reason to treat such evidence differently than other relevant evidence is
> treated.

"The devastating effects that the deaths of the victims had on their families and loved ones

is 'certainly part and parcel of the circumstances' of the crime properly presented to the jury

at the penalty phase of trial."  *United States v. McVeigh*, 153 F.3d 1166, 1218 (10th Cir.

1998)(quoting *Bonin v. Vasquez*, 807 F.Supp. 589, 613 (C.D.Cal. 1992), aff'd, 59 F.3d 815

(9th Cir. 1995).  See also, *Jones v. United States*, 527 U.S. 373, 395, 119 S.Ct. 2090, 2105,

144 L.Ed.2d 370 (1999)( Eighth Amendment allows a capital sentencing jury to consider

evidence of victim's personal characteristics and the emotional impact of the murder on the

victim's family.)  If, however, the evidence introduced is "so unduly prejudicial that it

renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment

provides a mechanism for relief."  *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597,

2608, 115 L.Ed.2d 720 (1991) (citing *Darden v. Wainwright*, 477 U.S. 168, 179-183, 106

S.Ct. 2464, 2470-2473, 91 L.Ed.2d 144 (1986)).  As stated in *Darden*, the question this Court

must consider is whether the evidence introduced "so infected the trial with unfairness as to

make the resulting conviction a denial of due process."  *Darden, supra*, U.S. at 181, S.Ct. at

2471 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

During his direct appeal, Petitioner argued the admission of a recommendation of death by the victim's father violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. In considering Petitioner's challenge, the Oklahoma Court of Criminal Appeals, held:

> An opinion as to the appropriate punishment is permissible under 22 O.S. 1991, § 984(1). In *Ledbetter v. State*, 1997 OK CR 5, § 31, 933 P.2d 880, 890-891, we held this evidence will be viewed by this Court with a heightened degree of scrutiny and we will weigh the probative value of such evidence against its prejudicial effect. "Any opinion as to the recommended sentence should be given as a straightforward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification." *Id.* Such was done in this case, and we find no error.

*Taylor v. State*, 998 P.2d 1225, 1233 (Okla. Crim. App. 2000).

The Tenth Circuit, in *Hain v. Gibson*, 287 F.3d 1224, 1234-1240 (10th Cir. 2002), held "that the portion of *Booth* prohibiting family members of a victim from stating "characterizations and opinions about the crime, the defendant, and the appropriate sentence" during the penalty phase of a capital trial survived the holding in *Payne* and remains valid." Accordingly, this Court finds the Oklahoma Court of Criminal Appeals decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This Court must, therefore, determine if this error was harmless. *United States v. McVeigh*, 153 F.3d 1166, 1203 (10th Cir. 1998) (applying harmless error review where trial court may have abused its discretion in admitting certain victim impact testimony).

After carefully reviewing the jury trial transcript, this Court finds the error was harmless beyond a reasonable doubt. Specifically, prior to sentencing stage of Petitioner's trial, the jury had already found Petitioner guilty of one count of first degree murder and three counts of shooting with intent to kill. As to murder count, the jury also found Petitioner knowingly created a great risk of death to more than one person and the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. Whereas, the sentence recommendation challenged by Petitioner is but one sentence in a victim impact statement read by the victim's father in a trial that spanned over three days. Furthermore, it is obvious from the jury's note during the second stage of proceedings[14] and the length of time spent deliberating[15] that they seriously considered the various punishment options regardless of the recommendation of the victim's father. As such, this Court does not believe this one sentence affected the jury's ultimate decision regarding the appropriate sentence. Therefore, the evidence did not infect the trial with unfairness such that the resulting conviction was a denial of due process. *Darden, supra.* Accordingly, Petitioner's claim for relief is denied.

## VII. JURY COERCION

Petitioner's third claim for relief alleges the death verdict in his case was coerced by the trial court's responses to two juror notes during the second stage of the proceedings

---

[14]*See*, J.T.Tr. Vol. III, at p. 780. *See also*, Court's Exhibit 2 .

[15]The record reflects, during the second stage of the proceedings, the jury retired to deliberate at 4:30 p.m. J.T.Tr. Vol. III, at p. 780. The verdict was returned at 9:50 p.m. *Id.*, at p. 786.

thereby depriving him of his Sixth Amendment right to a fair trial; his Eighth Amendment right to a reliable sentencing hearing, and his Fourteenth Amendment right to due process. Specifically, Petitioner asserts the effect of: 1) not answering the jury's question regarding whether Petitioner would ever get out of prison if given life without parole and 2) advising the jury that, in the event the jury was unable to reach a unanimous decision regarding punishment, the court would sentence Petitioner to either imprisonment for life or life without parole coerced the jury into returning a death verdict. Respondent urges this Court to find the state's adjudication of this issue is not contrary to and does not involve an unreasonable application of relevant federal law, pursuant to 28 U.S.C. § 2254(d).

The jury began second stage deliberations at 4:30 p.m. Sometime during the course of deliberations, the jury sent out a note to the court asking "Is there any chance of Charles Taylor getting out of prison if given life without parole? <u>Ever</u>!" /s/ George O'Brien [Jury Foreman]. Court's Exhibit 2 (emphasis in original). *See also*, J.T.Tr. Vol. III, at p. 780. The trial court responded by advising the jury: "You have received all the law and evidence that is applicable in this case. The Court cannot answer any further. /s/ Thomas M. Barthield [Trial Judge]" O.R. 314, Supplemental Instruction Number 2. *See also*, J.T.Tr. Vol. III, at p. 781.

The jury continued their deliberations and then, between 8:00 and 8:24 p.m., sent out another note indicating: "We Are Deadlocked at 11-1." /s/ George O'Brien. Court's Exhibit 3. *See also*, J.T.Tr. Vol. III, at p. 783-785. At 8:24 p.m, the Court responded to this note by sending the jury Supplemental Instruction Number 3 which said: "If on further deliberation

you are unable to agree unanimously as to punishment, I shall discharge you and impose a sentence of imprisonment for life without parole or imprisonment for life. /s/ Thomas M. Bartheld" O.R. 315. *See also*, J.T.Tr. Vol. III, at pp. 784-786. At 9:50 p.m., the jury advised the judge they had reached a unanimous verdict of death, finding two aggravating circumstances: Petitioner had knowingly created a great risk of death to more than one person and the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. J.T.Tr. Vol. III, at p. 786.

Although Petitioner argued on direct appeal that the effect of failing to answer the jury's question about life without parole and then giving an instruction that the court would take the case from the jury if it could not reach a decision as to the punishment, after the jury stated it was deadlocked, was a violation of his constitutional rights, the Oklahoma Court of Criminal Appeals decided this issue on state law grounds only, holding whether or not to give an *Allen* instruction remains a question best directed to the sound discretion of the trial judge and it was not error to refuse to define life imprisonment without the possibility of parole. *Taylor v. State*, 998 P.2d 1225, 1232 (Okla. Crim. App. 2000). Since the state court did not address the constitutional claims, this Court must address the issue *de novo*. *Darks v. Mullin*, 327 F.3d 1001, 1012 (10th Cir. 2003) and cases cited therein.

While the Supreme Court, in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), upheld the giving of a supplemental instruction to a jury unable to reach a consensus, the supplemental instruction given here is slightly different than a traditional *Allen* charge because it was given during the penalty phase of proceedings as opposed to the

guilt phase. Therefore, this Court must consider whether the instruction, as given by the trial court, improperly coerced the jury verdict. *See generally Lowenfield v. Phelps*, 484 U.S. 231, 241, 108 S.Ct. 546, 552, 98 L.Ed.2d 568 (1988) ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body."). In order to ascertain whether a supplemental instruction is coercive, a reviewing court must look at the supplemental charge given by the trial court "in its context and under all the circumstances." *Id.*, at U.S. 237, S.Ct. 550 (quoting *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965) (*per curiam*).

In *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), a capital case, the United States Supreme Court reaffirmed the use of supplemental jury instructions, traditionally referred to as the *Allen* charge, citing *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The Supreme Court, in considering petitioner's allegation of jury coercion, indicated a reviewing court must "consider the supplemental charge given by the trial court 'in its context and under all circumstances.' *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965) (*per curiam*)."

In *Lowenfield*, during the second day of deliberations the jury foreman sent the trial court a note indicating they were unable to reach a decision and requesting the court to again advise the jury of its responsibilities. The court brought the jury into the courtroom and had each juror write their name on a piece of paper along with an answer regarding whether "further deliberations would be helpful in obtaining a verdict." Once the jurors had complied

they were asked to retire to the jury deliberation room. *Lowenfield*, *supra*, U.S. at 234, S.Ct. at 549.

The jurors' answers revealed that eight jurors felt more deliberations would be helpful and four felt they would not. The trial court overruled defense counsel's motion for a mistrial, indicating this was the first indication that the jury was having difficulty reaching a verdict in the penalty phase of the trial. The court decided to return the jury to the courtroom and instruct them again regarding their obligations in reaching a verdict. By the time the jury returned to the courtroom, a new note was given to the judge. This note indicated some of the jurors had misunderstood the question previously asked by the court. The court polled the jury again asking the question in a slightly different way, "Do you feel that any further deliberations will enable you to arrive at a verdict?" Following this question, eleven jurors answered affirmatively and one negatively. The court then advised the jury if they were unable to reach a unanimous verdict the court would impose a "sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence." *Id.*, U.S. at 234 - 235, S.Ct. at 549.

No objections were made regarding the court's decision to conduct either jury poll, the manner the polls were conducted, or to the supplemental instruction given by the court. Within thirty minutes of resuming deliberations, the jury returned with a verdict of death. While the Court recognized the potential for coercion existed, the court held, based upon the facts in *Lowenfield*, "the combination of the polling of the jury and the supplemental

instruction was not 'coercive' in such a way as to deny petitioner any constitutional right." *Id.*, U.S. at 241, S.Ct. at 552.

Additionally, in *Darks v. Mullin*, 327 F.3d 1001, 1013-1016 (10th Cir. 2003), *cert. denied*, 540 U.S. 968, 124 S.Ct. 433, 157 L.Ed.2d 315 (2003), the Tenth Circuit refused to find the jury was coerced where the judge *sua sponte* called the jury into the courtroom after it had been deliberating for four and a half hours and asked about its numerical division. Unlike the instant case, the jury in *Darks* "had not indicated it was deadlocked and had earlier asked a question indicating it was leaning toward a sentence of life without parole." *Id.*, at 1014. Finally, the jury reached its verdict in less than twenty minutes after receiving a supplemental instruction informing them of the consequences of an inability to reach a unanimous verdict. In considering *Darks* allegation that the court's supplemental instruction was coercive, the Tenth Circuit relied on the principles enunciated in *Lowenfield*. Additionally, the Circuit identified the following factors which should be considered by courts in making a coercion determination:

> (1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations. *Gilbert*, 302 F.3d at 1173 (quoting *United States v. Arney*, 248 F.3d 984, 988 (10th Cir. 2001)); *see also United States v. Porter*, 881 F.2d 878, 888 (10th Cir. 1989) (considering, in addition to first three factors listed above, whether trial court gave instruction before jury reached deadlock).

*Darks*, *supra* at 1013.

The supplemental instruction upheld in *Darks* contains the same substantive language as the challenged instruction herein.[16]  In upholding the use of the substantive portion of the *Darks* instruction, the court found where "a neutrally phrased supplemental instruction is directed at all jurors rather than just those holding a minority view, and encourages them to continue deliberations, it reduces the possibility of coercion.  *See Arney*, 248 F.3d at 988." *Id.*, at p. 1014.

Nothing in the language of the instruction given by the trial court in this case was coercive.  The supplemental instruction simply advised the jury that the court would impose a sentence of life imprisonment without parole or imprisonment for life if the jury was unable to reach a unanimous verdict.  The instruction was addressed to all jurors rather than those holding the minority view and it did not state that a hung jury was unacceptable or that the jury must reach a unanimous verdict.  Thus, the jurors knew they would be discharged with or without a unanimous verdict.  *Id*., at 1014.

Next, Petitioner asserts the trial court's refusal to further instruct on life without parole upon receipt of the jury's first note should be weighed in favor of a finding that the jury's verdict was coerced.  Petitioner does not discuss why he believes the court's response to the

---

[16]The instruction in *Darks* was as follows:

> Ladies and gentlemen of the jury, you have advised me through your foreperson that you have not reached a unanimous verdict as to punishment.  I am going to ask you to deliberate further.  You are advised that if upon further deliberation you are unable to agree unanimously as to a punishment recommendation, I shall discharge you, and according to law, I must impose either a sentence of life or a sentence of life without parole.  You are excused at this time back into [the bailiff's] charge for further deliberations.

*Darks*, *supra* at 1012.

jury's question contributed to a coerced verdict and this Court does not believe it did. To the contrary, the court's response simply referred to the jury back to the original instructions. Further, at the time of the court's response, the jury was still actively engaged in deliberations and the court was unaware of the jury's numerical division. While the jury's note may have suggested they were considering a sentence of life without parole, nothing in the court's response coerced a death sentence.

Additionally, the second supplemental instruction was given to the jury after the jury advised the court that it was deadlocked. At that time, the jury had been deliberating for approximately four hours. After receiving the second supplemental instruction, the jury subsequently deliberated at least an hour and twenty minutes before returning its verdict. While there maybe a suggestion of coercion when a jury returns its verdict soon after receiving a supplemental instruction, where defense counsel does not object to the supplemental instructions, courts have held this suggests the potential for coercion was not apparent on the spot. *Lowenfield*, *supra*, U.S. at 241, S.Ct. at 552 and cases cited therein.

To support his argument that the court's instruction was what "coerced" the jury into reaching a death sentence, Petitioner cites to Exhibit Nine, an affidavit from Curtis Wayne Dean, which contains details of the jury's deliberative process. Under the Federal Rules of Evidence, however, testimony regarding the deliberative process, the motives of individual jurors and their conduct during deliberations is inadmissible. Fed.R.Evid. 606(b).[17]

---

[17]Rule 1101(e) of the Federal Rules of Evidence provides that the Federal Rules of Evidence are applicable to habeas corpus actions brought under 28 U.S.C. § 2254. Rule 606(b) provides:

Additionally, Oklahoma statutes prohibit consideration of juror statements regarding matters affecting jury deliberations. 12 O.S. § 2606(b). *See* also, *Tanner v. United States*, 483 U.S. 107, 117-127, 107 S.Ct. 2739, 2745-2751, 97 L.Ed.2d 90 (1987); *Gosier v. Welborn*, 175 F.3d 504, 510-511 (7th Cir. 1999) (applying Fed.R.Evid. 606(b) to capital habeas proceedings); *Bacon v. Lee*, 225 F.3d 470, 485 (4th Cir. 2000) (same); *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2nd Cir. 1994) (holding juror affidavit inadmissible under Fed.R.Evid. 606(b) where affidavit recounted how one juror's disclosure of personal knowledge about area where crime was to have occurred to other jurors affected the mental processes of other jurors); *Bannister v. Armontrout*, 4 F.3d 1434, 1444 n. 15 (8th Cir. 1993); and *Silagy v. Peters*, 905 F.2d 986, 1008-1009 (7th Cir. 1990). *But see*, *Brown v. Gibson*, 7 Fed.Appx. 894 (10th Cir. 2001) (Although court assumed without deciding it could consider a juror's affidavit regarding racial prejudice, court acknowledges 12 O.S. 21 2606(B) and Fed.R.Evid. 606(b)).    To the extent Dean's affidavit recounts what jurors were thinking during deliberations, the voting of individual jurors or the deliberations of the jury as a whole, including the number of jurors voting for or against the death penalty at various stages of the

---

**Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

proceedings, this Court finds the affidavit is not admissible and therefore, will not be considered by this Court.

After reviewing the instructions as a whole, this Court finds the supplemental instruction was not, in any way, coercive. To the contrary, the instruction merely advised the jury of the law applicable in the event the jury was not able to reach a unanimous verdict.[18] It did not suggest a need for compromise or expediency nor did it attempt to influence the jury to return a verdict of death. *See*, *Darks v. Mullin*, 327 F.3d 1001, 1016 (10th Cir. 2003). Accordingly, this Court finds the challenged instruction did not deny Petitioner his right to a fair and impartial jury trial. *See Lowenfield, supra*, U.S. at 241, S.Ct. at 546; *see also, Montoya v. Scott*, 65 F.3d 405, 414 (5th Cir. 1995) (holding in habeas context, Petitioner must establish the supplemental charge was so coercive it unconstitutionally rendered trial fundamentally unfair); and *Darks, supra* (approving use of similar supplemental instruction where trial court *sua sponte* called jury into courtroom and asked about its numerical division prior to jury indicating it was deadlocked). Accordingly, Petitioner is not entitled to relief on this issue.

---

[18]The challenged instruction appears to track the Oklahoma statute. *See*, 21 O.S. 1991, § 701.11. The language contained in this instruction was not contained in the instructions given to the jury before they began deliberations during the second stage of trial. *See*, O.R. 316-331.

# VIII. JURY INSTRUCTIONS

Petitioner's fourth ground for relief alleges his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated when the trial court gave a materially erroneous lesser included offense instruction thereby effectively denying Petitioner of his right to a lesser included offense instruction. Again, Respondent argues Petitioner has not established that the adjudication of this claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Petitioner first raised this issue in his direct appeal. In denying relief, the Oklahoma Court of Criminal Appeals found:

> In [Petitioner's] second proposition of error, he contends the fifth element of the second degree murder instruction [Instruction Number 17] was defective and warrants reversal of his conviction for first degree murder. The fifth element read as follows: "*Fifth*, the conduct is not done with the intention of taking life **or harming** any particular individual." Both parties recognize the removal of the "**or harming**" language in the Second Edition of the Uniform Criminal Jury Instructions [OUJI-CR 2d 4-91] was ordered by this Court in *Willingham v. State*, 1997 OK CR 62, ¶ 23, 947 P.2d 1074, 1080-81, *cert. denied*, 524 U.S. 930, 118 S.Ct 2329, 141 L.Ed.2d 702 (1998). However, the State contends giving the instruction containing the "or harming" language was harmless error, because in Willingham this Court said that second degree depraved mind murder was not a lesser included offense of first degree murder and the instruction should not have been given at all. [Petitioner] submits he was entitled to the instruction because the evidence supported it.
> We disagree. The elements of second degree depraved mind murder are as follows:
> 1. death of a human;
> 2. caused by conduct which was imminently dangerous to another person;
> 3. the conduct was that of the defendant;

4. the conduct evinced a depraved mind in extreme disregard of human life;

5. the conduct is not done with the intention of taking the life of any particular individual.

[Petitioner] testified that as he ran through the living room, he saw movement out of the corner of his eyes and fired in that direction twice, killing Sauer. These facts suggest a design to effect the death of Sauer and therefore do not support a second degree murder instruction. *Cf. Paxton v. State*, 1993 OK CR 59, ¶ 7, 867 P.2d 1309, 1316, *cert. denied*, 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994) (holding second degree murder instruction appropriate only "where there is no premeditated design to kill any particular person."); *Shrum*, 1999 OK CR 41, ¶ 10, 991 P.2d at 1036 (holding trial court should only instruct on lesser included and/or related offenses where the evidence warrants giving such an instruction). Accordingly, any error in the language of Instruction Number 17 was harmless beyond a reasonable doubt, because [Petitioner] was not entitled to the instruction at all. *Simpson v. State*, 1994 OK CR 40, ¶ 35-36, 876 P.2d 690, 702; *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); 20 O.S.1991, § 3001.1.

*Taylor v. State*, 998 P.2d 1225, 1231 (Okla. Crim. App. 2000).

As a general rule, improper jury instructions do not form the basis for federal habeas corpus relief. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In attempting to set aside a state conviction based on an erroneous jury instruction, a § 2254 petitioner has a heavy burden. Generally, such errors are not reviewable in federal habeas proceedings, "unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law." *Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997) (citing *Long v. Smith*, 663, F.2d 18, 23 (6th Cir. 1981)).

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process", *Cupp v. Naughten*, 414 U.S., at 147,

> 94 S.Ct., at 400, 38 L.Ed.2d 368, not merely whether "the instruction is
> undesirable, erroneous, or even 'universally condemned,'" *Id.*, at 146, 94 S.Ct.,
> at 400.

*Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977)

(footnote omitted).

Issues regarding whether a jury was properly instructed are questions of law. *United States v. Voss*, 82 F.3d 1521 (10th Cir. 1996). Accordingly, this Court must decide whether the Oklahoma court's decision regarding jury instruction issues was "contrary to . . . clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

Failure of a state trial court to give instructions on lesser included offenses does not generally state a claim cognizable in federal habeas corpus. *Muller v. Israel*, 510 F.Supp. 730 (E.D. Wis. 1981) and cases cited therein. See also, *Poulson v. Turner*, 359 F.2d 588 (10th Cir. 1966), *cert. denied*, 385 U.S. 905, 87 S.Ct. 219, 17 L.Ed.2d 136 (1966). Where, however, a state's capital sentencing scheme has the potential for unreliable sentencing, the failure to allow the jury to consider a verdict of guilt of a lesser included noncapital offense which is warranted by the evidence can state a constitutional claim. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In *Hopper v. Evans*, 456 U.S. 605, 609, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the Supreme Court reiterated that lesser included instructions were only required when supported by the evidence. In *Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998), the Supreme Court indicated, however, that a lesser included instruction is not required if there is no lesser included offense under state law.

Clearly, the Oklahoma Court of Criminal Appeals has held, under Oklahoma law, second degree depraved mind murder is not a lesser included offense of first degree murder. *Willingham v. State*, 947 P.2d 1074, 1080-1082 (Okla. Crim. App. 1997), overruled on other grounds, *Shrum v. State*, 991 P.2d 1032 (Okla. Crim. App. 1999). *See also, Mitchell v. Gibson*, 262 F.3d 1036, 1051, n. 7 (10th Cir. 2001). Furthermore, under Oklahoma law, a voluntary intoxication instruction is only warranted if a defendant is unable to form any specific criminal intent. *Brogie v. State*, 695 P.2d 538, 546 (Okla. Crim. App. 1985) and *Miller v. State*, 567 P.2d 105, 109 (Okla. Crim. App. 1977). Where a criminal defendant is able to give a detailed lucid account of his criminal activity he is not be entitled to a voluntary intoxication instruction. *Valdez v. State*, 900 P.2d 363, 379-380 (Okla. Crim. App. 1995), overruled on other grounds, *Valdez v. State*, 46 P.3d 703 (Okla. Crim. App. 2002).

Thus, this Court finds, under Oklahoma law, the evidence did not warrant instructing the jury on any lesser included offense. To the extent the facts did not support the giving of a second degree murder instruction, giving of the erroneous instruction could not have so infected the trial to such a degree that Petitioner was denied a fair trial or deprived of due process. Accordingly, this Court finds Petitioner has failed to establish that the state court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to relief on this claim.

## IX.  FAILURE TO PROVIDE ADEQUATE INSTRUCTIONS ON "LIFE WITHOUT PAROLE" SENTENCING OPTION

In his sixth ground for relief, Petitioner argues the trial court provided inadequate instructions on the life without parole sentencing option thereby violating his Sixth Amendment right to a fair trial, his Eighth Amendment right to a fair sentencing hearing and his Fourteenth Amendment right to due process of law.  Petitioner cites to the note sent out by the jury during the second stage of proceedings, discussed in detail in section VII herein, to support his argument that the court's instructions were inadequate.

Respondent argues that the decision of the Oklahoma Court of Criminal Appeals did not result in a decision that was  either contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Therefore, Respondent asserts Petitioner is not entitled to relief on this issue.

In *Simmons v. South Carolina*,  512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the Supreme Court held where the State argues in a capital sentencing proceeding that the petitioner presents a future threat, due process requires that he be permitted to inform the jury that he is parole ineligible.  In this case, the jury was given three discrete sentencing options – death, life imprisonment and life imprisonment without the possibility of parole. The Tenth Circuit has consistently held that instructing on these three options, without any additional explanation, satisfies *Simmons*.  *Neill v. Gibson,* 263 F.3d 1184, 1198 (10th Cir. 2001) (citing *Mayes v. Gibson*, 210 F.3d 1284, 1294 (10th Cir. 2000), *cert. denied*, 531 U.S.

1020, 121 S.Ct. 586, 148 L.Ed.2d 501 (2000)).  Accordingly, this Court finds Petitioner has failed to show he is entitled to relief on this claim.

## X.  SUFFICIENCY OF EVIDENCE TO SUPPORT "AVOID ARREST" AGGRAVATOR

In his seventh proposition of error, Petitioner alleges there was insufficient evidence to support the finding of the "avoid or prevent lawful arrest or prosecution" aggravating circumstance.  Respondent argues there was sufficient evidence for the jury to find this aggravator beyond a reasonable doubt and that the Petitioner has failed to show that the state court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

The United States Supreme Court held, in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *reh. denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), in a federal habeas proceeding challenging the sufficiency of the evidence in a state trial, that a reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Further, the Court indicated following conviction, a judicial review of the "evidence is to be considered in the light most favorable to the prosecution."  *Id.*  In *Lewis v. Jeffers*, 497 U.S. 764, 782, 110 S.Ct. 3092, 3103, 111 L.Ed.2d 606 (1990), the Court said the principles enunciated in

*Jackson* apply with equal force to federal habeas review of a state court's finding of aggravating circumstances.

> Although aggravating circumstances are not "elements of any offense, see *Walton, Id.,* 497 U.S., at 648-649, 110 S.Ct., at 3054-3055, the standard of federal review for determining whether a state court has violated the Fourteenth Amendment's guarantee against wholly arbitrary deprivations of liberty is equally applicable in safeguarding the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty. Like findings of fact, state court findings of aggravating circumstances often require a sentencer to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson, supra*, 443 U.S., at 319, 99 S.Ct., at 2789.

*Lewis v. Jeffers*, *supra*.

Petitioner first raised this claim in his direct appeal. In rejecting the claim on the merits, the Oklahoma Court of Criminal Appeals found:

> "The focus of the aggravator that the murder was committed to avoid lawful arrest or prosecution is the state of mind of the murderer; it is he who must have the purpose of avoiding or preventing lawful arrest or prosecution." *Gilbert v. State*, 1997 OK CR 71, ¶ 104, 951 P.2d 98, 122, *cert. denied*, 525 U.S. 890, 119 S.Ct. 207, 142 L.Ed.2d 170 (1998). Further, this aggravator requires a predicate crime, separate from the murder, for which the appellant seeks to avoid arrest or prosecution. *Id. See also Barnett v. State*, 1993 OK CR 26, ¶ 30, 853 P.2d 226, 233. The record clearly supports a finding that [Petitioner] shot Sauer to avoid arrest or prosecution for the attempted murder of Steve Verner.

*Taylor v. State*, 998 P.2d 1225, 1232 (10th Cir. 2000).

Clearly, under Oklahoma law, this aggravator focuses on the defendant's intent. A defendant's intent can be proven through a defendant's own statements or circumstantial evidence. Additionally, the prosecution must establish that there was a predicate crime, other than the murder for which the defendant seeks to avoid arrest or prosecution. *Romano v.*

*Gibson*, 278 F.3d 1145, 1154-1155 (10th Cir. 2002), citing *Romano v. Gibson*, 239 F.3d 1156, 1179 (10th Cir. 2001), *cert. den.* 534 U.S. 1045, 122 S.Ct. 624, 151 L.Ed.2d 545 (2001).

Petitioner argues, since the prosecution was forced to rely on circumstantial evidence to establish the avoiding lawful arrest aggravating circumstance, the evidence was insufficient under state law to rule out all other reasonable hypotheses inconsistent with guilt. In particular, Petitioner argues the facts as gleaned solely from his testimony, (*i.e.* Petitioner had no motivation to shoot Sauer and the shooting was solely a reaction to observing something out of the corner of his eye while under the influence of methamphetamine) precluded the jury from finding the existence of this aggravating factor beyond a reasonable doubt. Nothing prevented the jury, however, from rejecting Petitioner's testimony in its entirety. Furthermore, the Oklahoma Court of Criminal Appeals has consistently held that a defendant's intent to murder in order to avoid arrest or prosecution for the commission of a separate crime must often be inferred from circumstantial evidence. *See*, *Smith v. State*, 932 P.2d 521, 536 (Okla. Crim. App. 1996), *cert. denied*, 521 U. S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997); *McGregor v. State*, 885 P.2d 1366, 1385 (Okla. Crim. App. 1994), *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Fox v. State*, 779 P.2d 562, 575-76 (Okla. Crim. App. 1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990).

Based on the record herein, this Court finds that the determination by the Oklahoma Court of Criminal Appeals that there was sufficient evidence to support the "avoid arrest" aggravating circumstance is not unreasonable but is entirely consistent with the evidence at

trial. In particular, the evidence established Petitioner related to others his intent to shoot Verner. On the night of the shootings, Petitioner went to the Verner residence armed with a 9mm loaded pistol hidden in the waistband of his pants. Petitioner made no attempts to hide his identity before shooting Verner at close range directly in the face. Petitioner then shot all of the witnesses at the scene as he fled to a waiting getaway car. When the police began to follow Petitioner, Petitioner threw the weapon out of the car window. Additionally, the getaway car made no attempts to stop as police chased it at speeds up to 130 m.p.h., before it lost control and rolled several times. In light of these facts, the jury clearly had sufficient evidence to conclude Petitioner shot Sauer to avoid being arrested or prosecuted for the attempted murder of Steven Verner.

Finally, determinations of factual issues by a state court are presumed correct. 28 U.S.C. § 2254(e)(1). "A state court's finding of an aggravating circumstance in a particular case . . . is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Lewis v. Jeffers*, *supra*, U.S. at 783, S.Ct. at 3103.

Petitioner has not presented any evidence to rebut the factual findings by the state appellate court and having conducted a review of the entire record herein, this Court finds that the state court's factual findings are clearly supported by the record and, thus are not arbitrary or capricious. Therefore, this Court finds Petitioner's arguments that the aggravating circumstance is not supported by the evidence lacks merit.

## XI. CONCLUSION

After a thorough review of the Petition for Writ of Habeas Corpus, the Respondent's Response, Petitioner's Reply, and the state court records filed herein, this court finds Petitioner has failed to establish that he is currently in custody in violation of the Constitution, laws or treaties of the United States as required by 28 U.S.C. § 2254(a). Therefore, for the reasons stated herein, Petitioner's Petition for Writ of Habeas Corpus (Docket No. 14) is hereby denied. Additionally, for the reasons set forth herein, Petitioner's request for an Evidentiary Hearing is denied.

**ACCORDINGLY IT IS HEREBY ORDERED THAT:**

1. Marty Sirmons is substituted for Gary Gibson as the sole party Respondent and the Court Clerk is directed to note such substitution on the record.

2. Petitioner's request for habeas relief (Dkt. No. 14) is denied.

3. Petitioner's request for an evidentiary hearing, contained within his Petition, is denied.

**It is so ordered on this 12th day of March, 2007.**

James H. Payne
United States District Judge
Eastern District of Oklahoma